IN THE UNITED STATES COURT FOR THE DISTRICT OF UTAH

CENTRAL DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>vs.<br><br>LANCE W. MERCER,<br><br>Defendant. | ORDER REGARDING SENTENCING ENHANCEMENT<br><br><br><br>Case No. 2:06-cr-00161 |

On January 11, 2007, the court sentenced the defendant in this case — an accountant who had pled guilty to willfully aiding and assisting in the preparation and filing of a false tax return. Remarkably, however, at the sentencing hearing, the government took the position that the defendant had *not* used a special skill or violated a position of trust in preparing those false returns — even though the Federal Sentencing Guidelines plainly called for an enhancement in such a case. In other words, this appears to be a case of the prosecutor "swallowing the gun,"[1] in the colorful phrase that is often used to describe a decision by the government to argue a position contrary to the obvious facts. A brief opinion is appropriate to highlight the government's failure

---

[1] *See* Robert H. Edmunds, Jr., *Analyzing the Tension Between Prosecutors and Probation Officers over Fact Bargaining*, 8 FED. SENT. R. 318 (1996) ("It has been the policy of the Department of Justice from the day the guidelines were implemented not to 'swallow the gun.'").

to apply the Guidelines honestly and fairly here.

## BACKGROUND

On March 22, 2006, Lance W. Mercer was indicted on ten counts of willfully aiding and assisting in the preparation and filing of a false tax return in violation of 26 U.S.C. § 7206(2). At the time, Mr. Mercer was employed by the Mercer Consulting Group in Bountiful, Utah. Since at least 1999, he had worked as a tax preparer, preparing both federal and state individual income tax returns. Mr. Mercer, who had earned a Master's degree in tax accountancy from Weber State University, aided numerous individuals in this capacity over the course of the years.

The Internal Revenue Service began investigating Mr. Mercer, undercover, in 2002. As part of the investigation, an undercover agent met with Mr. Mercer to have his taxes prepared. During the course of this meeting, the agent told Mr. Mercer that he had paid $1,600 in taxes the prior year. Mr. Mercer asked the agent how much he expected to owe for tax year 2001. The agent indicated he expected to owe between $1,600 and $2,000.

When the agent picked up his tax return from Mr. Mercer about a month later, he noticed that, among other things, Mr. Mercer had failed to include some of his income on the return. When the agent asked Mr. Mercer about it, Mr. Mercer responded that it was necessary to omit that income if the agent wanted his tax liability down around $2,000. In addition, Mr. Mercer advised the agent that the figures he had used were reasonable enough that they would not raise any red flags with the IRS, so the return should "fly through." In whole, on the agent's return, Mr. Mercer either inflated or falsified numbers in thirteen out of sixteen expense categories.

After conducting this undercover investigation, the government executed a search warrant at Mr. Mercer's business, analyzed tax returns found there, and interviewed some of Mr.

Mercer's clients.  The investigation revealed misconduct sufficient to charge Mr. Mercer with ten counts of assisting and advising taxpayers to include false and fraudulent information on their returns.  This conduct had the effect of reducing the taxpayers' total tax liabilities.  In other words, it led to Mr. Mercer's clients receiving income tax refunds to which they were not entitled or to the clients paying less income tax than they should have.  To achieve this result, Mr. Mercer manipulated various tax schedules.  For example, he would create and falsify itemized deductions on Schedule A, create and falsify business deductions on Schedule C, shift self-employment income from Schedule C to Schedule E to avoid self-employment taxes, deduct personal and non-deductible expenses as business expenses on Schedule C, and deduct the same expense more than one time on the same tax return.

      Ultimately, Mr. Mercer pleaded guilty to one count of tax fraud.  As part of the plea agreement, the United States agreed that it would not seek — indeed, that it would object to — any enhancements under Chapters 2 or 3 of the Guidelines, even if the enhancements were otherwise applicable.  Pursuant to this agreement, at the sentencing hearing, the United States specifically objected to the probation office's application of a two-level enhancement for abuse of a position of trust or use of a special skill under § 3B1.3 of the Guidelines.  If the enhancement applied, Mr. Mercer's total offense level would call for Mr. Mercer to serve a term of imprisonment.  Specifically, with a total offense level of twelve and a criminal history category of I, the Guideline range for Mr. Mercer's sentence would be ten to sixteen months, with the Guidelines calling for at least one-half of the term to be satisfied by actual imprisonment (rather than home confinement or other alternatives).  On the other hand, if the enhancement did not apply, Mr. Mercer's total offense level would be only ten, which produces a Guideline sentence

range of six to twelve months. At that level, the Guidelines would not require a term of actual imprisonment.[2] So far as the court can determine, the reason the government agreed the enhancement did not apply had nothing to do with the actual facts of the case, but rather with the government's desire to avoid the sentence called for by the Guidelines.

## DISCUSSION

The court has taken the trouble of writing this opinion because the government's objection to an enhancement under § 3B1.3 in Mr. Mercer's case is flatly inconsistent with the Department's stated position of honesty in sentencing.

Section 3B1.3 of the Guidelines provides for a two-level enhancement if "the defendant abused a position of public or private trust, or used a special skill, in a manner that significantly facilitated the commission or concealment of the offense."[3] In the commentary to this section, "special skills" are defined as those "not possessed by members of the general public and usually requiring substantial education, training or licenses."[4] The Guidelines specifically enumerate an accountant as a position requiring special skills.[5] Mr. Mercer easily falls within this enumerated "accountant" example. He possessed a graduate degree in tax accountancy, and he had many years of experience as a tax preparer — this education and experience is certainly not possessed

---

[2] *See* U.S.S.G. § 5C1.1(c).

[3] *Id.* § 3B1.3.

[4] *Id.* § 3B1.3 cmt. 4.

[5] *See id.*; *see also United States v. Godwin*, 272 F.3d 659, 671 (4th Cir. 2001) (finding that the defendant occupied a position of trust due to her work as an accountant and tax preparer).

by members of the general public.[6]

The special-skills adjustment is obviously proper in Mr. Mercer's case because he used his special skills to facilitate the commission or concealment of the crime.  Mr. Mercer's crime was willfully aiding and assisting in the preparation and filing of a false tax return.  To commit this crime, Mr. Mercer used his knowledge of what figures would appear "reasonable" enough that the IRS would not scrutinize them.  He inflated and falsified numbers, and amended tax schedules, with the intent to make them "fly through" IRS processing without challenge.  Indeed, this specific knowledge of the tax code, the workings of the IRS, what would raise "red flags," and his experience preparing tax returns provided him with exactly what he needed to decrease his clients' tax liability.  Even in the absence of such facts, a special-skills enhancement would apply — courts have found special skills were used for accounting purposes even when the skills used were "routine."[7]

The enhancement would be similarly appropriate under § 3B1.3 for the separate and independent reason that Mr. Mercer abused a position of public or private trust.  This public-trust provision applies to those in a position "characterized by professional or managerial discretion."[8]  Our nation's tax system obviously vests significant trust in the accounting profession to ensure

---

[6] *See United States v. Noah*, 130 F.3d 490, 500 (1st Cir. 1997) (holding that the defendant's skill as a tax preparer gave him a level of knowledge and proficiency exceeding that possessed by the general public).

[7] *See, e.g.*, *United States v. Covey*, 232 F.3d 641, 647–48 (8th Cir. 2000) (upholding finding that an accountant used special skills in preparing routine loan documents in order to effect a money laundering scheme); *United States v. Frizson*, 979 F.2d 21, 22–23 (2d. Cir. 1992) (upholding an enhancement where an accountant used special skills to file false tax returns, even though unskilled individuals could feasibly commit the same offense).

[8] U.S.S.G. § 3B1.3 cmt. 1.

tax returns are properly filed.  Mr. Mercer abused this trust by manipulating the personal financial information on tax returns in a way that violated the law.[9]

In spite of the obvious applicability of this enhancement to Mr. Mercer, the government actually *objected* to enhancing his sentence under § 3B1.3.  This approach blatantly violates the honesty-in-sentencing approach that the court understands to be Department policy.  In a memorandum by then-Attorney General John Ashcroft, the Department set out its policy that "[a]ny sentencing recommendation made by the United States in a particular case must honestly reflect the totality and seriousness of the defendant's conduct and must be fully consistent with the Guidelines and applicable statutes and with the readily provable facts about the defendant's history and conduct."[10]  This requirement specifically "applies fully to sentencing recommendations that are contained in plea agreements."[11]  Moreover, Department attorneys should only agree to downward departures in rare circumstances and "[p]rosecutors must affirmatively oppose downward departures that are not supported by the facts and the law."[12]

Of course, the government is free to deviate from its internal policies.  But there ought to be, at least, some legitimate, articulated reason for such a deviation.  The government provided no such reason here.  The only justification the Department's attorney provided for his opposition

---

[9] That the government was the victim in this case does not defeat application of this enhancement.  *See, e.g.*, *United States v. Bhagavan*, 116 F.3d 189, 193 (7th Cir. 1997) (upholding enhancement for a CEO who convinced customers to make false certifications, with the claimed sole purpose of evading tax liability).

[10] Memorandum from John Ashcroft to All Federal Prosecutors, Department Policy Concerning Charging Criminal Offenses, Disposition of Charges, and Sentencing (Sept. 22, 2003), *available at* http://www.usdoj.gov/opa/pr/2003/September/03_ag_516.htm.

[11] *Id.*

[12] *Id.*

to the enhancement was that it had been agreed to as part of the plea bargain.  Consequently, the court overruled the government's objection and imposed a sentence in accordance with the plain meaning of the Guidelines.[13]

At the core of the Ashcroft Memorandum is the goal of honesty and fairness in sentencing.  Compliance with the Ashcroft Memorandum prevents the spectacle of government attorneys arguing to the court things that are contrary to fact — it avoids prosecutors "swallowing the gun."  In this case, the government did swallow the gun, as the Department's attorney ended up *objecting* to the court's virtually indisputable conclusion that accountants preparing tax returns either use special skills or occupy positions of trust.  It seems incredible for the Department to take this position here, while arguing in other fora that "failure to comply with the [sentencing] guidelines has already meant reduced sentences in cases throughout the country, and if not addressed, will mean a steady erosion in the deterrent value of federal sentencing policy, and, ultimately, in reduced public safety."[14]  The court firmly agrees with the generally-stated position of the Department that a sentencing system that involves ignoring the obvious facts is "neither desirable nor capable of sustaining long-term public confidence."[15]

The court has taken the trouble of writing this brief description of this case because it

---

[13] While the Guidelines are not mandatory but advisory, *see United States v. Booker*, 543 U.S. 220, 245 (2005), they frequently provide sound advice, *see United States v. Wilson*, 350 F. Supp. 2d 910, 913–14 (D. Utah 2005) — as they did in this case.

[14] *United States v. Booker: One Year Later — Chaos or Status Quo?: Hearing Before the Subcomm. on Crime, Terrorism, and Homeland Security of the H. Comm. on the Judiciary*, 109th Cong. 44 (2006) (statement of William W. Mercer, Principal Associate Deputy Att'y Gen., U.S. Dep't of Justice).

[15] *Id.*

seems at odds with the way the sentencing process ought normally to advance. If the government wishes to recommend a sentence that differs from that recommended by the Guidelines, there are legitimate vehicles for doing so.[16] But the facts are the facts — the government should not take disingenuous positions to the contrary in applying the Guidelines. In other words, the court fully agrees with the goals animating the Ashcroft Memorandum — ensuring the Guidelines are calculated fairly in cases before the court. Because the government seemingly deviated from this approach here, the Clerk of the Court is directed to transmit a copy of this opinion to the Assistant Attorney General of the Tax Division of the Justice Department to call this matter to the Division's attention.[17]

DATED this 31st day of January, 2007.

BY THE COURT:

_____
Paul G. Cassell
United States District Judge

---

[16] *See, e.g.*, Fed. R. Crim. P. 11(c)(1)(C) (parties can agree to specific sentence).

[17] The United States Attorney's Office for the District of Utah had no part in formulating the government's position in this matter.